The next case called for oral argument is National Material Company v. GSI Group. Counsel, whenever you're ready, you may proceed. Thank you, Judge. My name is Josh Vinson. I'm here on behalf of the plaintiffs' appellate, National Material Company. This is not an action about Elizabeth Taylor or insurance. This is an action for breach of contract and unjust enrichment. The circuit court in summary, too, I find against National Material Company finding that there was no writing sufficient to satisfy the general statute of frauds, that there was no meeting of minds, and that there was no cause of action for unjust enrichment in this case. There are really, I think, three issues presented in this case. I'm going to interrupt you right away because I have a problem. In looking at the complaint, is Count 5 still pending? You'll have to remind me which one. Is Count 5 for the letter agreement? I think Count 5 is the letter agreement that follows. Count 5 is the letter agreement, the January 5, 2009 letter agreement. Yes, that count is still pending. So how is this final? Well, the judge did make a 304A finding, and I think his determination was that this was a sufficiently separate branch of the controversy because the letter agreement is really something quite distinct from the two-year requirements contract that we contend was breached. It is certainly separate from the unjust enrichment claim that we contend exists in this case. So that's the basis for our jurisdiction in this case? 304A, yes. Okay, and so the counts that we're here on are actually an unjust enrichment count. That's Count 8, right? And then a contract count. That's correct, Count 3. And you would agree with me that you can't have a count for unjust enrichment if you have a valid contract? That's correct. They're pled in the alternative. Right, they have to be pled in the alternative. They are. So in this case, is the court saying that there's no question of fact as between the contract and unjust enrichment? You know, the court certainly found there was no question of fact with regard to the contract. As a matter of law, there was no writing sufficient to satisfy the statute of frauds. There was no meeting of the minds. So if you have no, and that's where I'm confused. Maybe you can help me. If you say that there's no contract. Right. How can you not have no unjust enrichment? How can you not have a fact? Oh, I agree with you. I couldn't agree with you more, Judge. And the reason for that is because of how the pricing worked in this case. I mean, that's really kind of the lynchpin in this whole case. When they asked for a pricing model that was based on a trailing index, you know, to say that they were not, assuming there's no contract, no question of fact that there's no contract, which I think is a pretty tough road to hoe. But assuming there was no contract, the fact is that that trailing index pricing model, they were at the time getting the benefit of pricing that was based on the past six months of indices, the difference between the last two quarters of the steel index, the crew index for steel. They were not, you know, if they had been paying the spot market price at that time, we'd have no unjust enrichment claim because we would have been getting a higher price at that point in time. But they got the benefit of that index pricing because prices were lower at that time and were starting to rise at the point of the breach. In fact, they had reached just about their highest point at the point that they breached at that point. And that was the stage where National Material was about to start to make its money on that case, on that contract. And they saved $9 million. It's an undisputed fact in this case. There's a chart at page C721 of the record that shows they saved $9 million because they were not paying spot market pricing. And that was the whole basis of the bargain here. And that's one of the things that I think is so unjust and unfair about the outcome of this case. Really, no matter which way you look at this case, if there was no contract, the case has to be reversed and sent back on unjust enrichment because there's no question they got a benefit at our detriment to which they were not entitled because they took advantage of a relationship, an agreement that was based on that trailing index pricing so that they wouldn't have to pay current prices, got all the $9 million benefit of it. And then the moment the market fell and steel prices dropped and we were stood in a position now to make money, they don't want to buy from us. They want to go on the spot market. It's like having your cake and eating it, too. And that's why we put the unjust enrichment on this case. Well, and maybe I should have asked that of the appellee. I still, it seems to me that it's a difficult road to hoe if you grant judgment on both the contract and the unjust enrichment clause in this case. And say there's no question of fact. And say there's no question of fact and it's a valid, or then there's no contract. Right. I agree with you. Okay. And we still have an issue pending on the letter agreement. Yes. That was a separate attempt to try and resolve that. There's no ruling on that. No. So the reason the judge issued a 304, I think a 304, is because you all tried to resolve the letter agreement count? No, that remains. Now, that's a total, so that's out there as well. Yeah, that's a separate issue. Separate issue is still pending below. I think that one of the significant issues in the case, and I think if you are going to send it back, one of the things that you do have to address is the question of whether the UCC or the general statute of frauds applies to this case. Because if you're going to give jury instructions on how the jury is supposed to decide were there sufficient writings to make a contract and was there a meeting in the minds, they need to know what the law is going to make. And in this case, we contend there is good precedent, solid precedent from throughout the country, the majority of jurisdictions, that when you have a sale of goods in excess of $500, as you have here, between merchants, UCC Article II governs the contract requirements. The court in this case held that the general statute of frauds applies. And no court in Illinois has ever addressed this question. When you have this sort of, you know, two potentially applicable sections, the Article II, UCC, and the general statute of frauds, do they conflict? And if they do, which one do you apply? Well, they certainly do conflict here. The general statute of frauds imposes, you know, much more significant requirements to show a contract. It has to show all the material terms in writing. Whereas under the UCC, under Article II, you don't need anywhere near that. All you need is something written that says what the quantity is, and that's it. And even if you don't have that, the UCC provides for exceptions where you don't even need a writing, and you can enforce the contract under sections 201, 3A, and B. So which one applies in this case is pretty significant, and there's clearly a conflict. You can't apply both under the circumstances of this case because obviously the general statute requires far more than the UCC requires, and so they clearly conflict. You can have a contract under one where you wouldn't have a contract under the other. And under those circumstances, we have the familiar rule that when you have two potentially applicable statutes and they conflict, you apply the one that is the more specific statute. This is the more specific statute. That's why the general statute of frauds is called the general statute of frauds is because it applies to a multitude of situations, promises of marriage, assuranceship, a variety of circumstances, contracts that can't be performed within the space of a year. But the UCC Article II applies specifically to the circumstances presented in this case, which is a sale of goods in excess of $500 between merchants. Now, there are a significant number of cases that have confronted this question, and the conclusion reached by the majority of jurisdictions, and I'm talking about the Fifth Circuit Court of Appeals, the Sixth Circuit Court of Appeals, New York, Minnesota, Kentucky, Michigan, have all found that these two, the general statute does conflict with Article II of the UCC under the circumstances almost identical to our case, and under those circumstances, the UCC controls. There are probably two cases in Illinois that involve the Barton Chemical case on the First District and the Arlington Elevator case, which I believe Justice Goldenherz wrote for this Court in 2012. Both involve sales of goods between merchants and apply the UCC Article II, even though both cases involve situations where the contracts would not be performed within the space of a year. Now, in fairness to GSI, the Court didn't squarely address the question of is there a conflict between the general statute and the UCC? But I think you can see between the fact that they are conflicting, as I've explained, that the majority of jurisdictions have gone the way we're urging that the UCC applies in this case, and the fact that the courts in this state that have come up against this issue have defaulted to using the UCC suggests that is the way to go. And I think from a public policy standpoint, the UCC was adopted really to grease the wheels of Congress. I mean, that is what business people rely upon. They need the consistency. They need the clarity that the UCC provides under these circumstances and that the general statute of frauds does not. We think that the jury, a jury in this case, could very readily find that there were writings sufficient to satisfy actually either the general statute of frauds or the UCC, but there's a plethora of evidence in this case that a jury would sink their teeth into and find it unfavorable. You know, we're not asking the Court to rule as a matter of law that there was a contract here. We're just asking for a trial in this case. And in this case, you've got GSI sending out a request for a proposal that specifies we're looking for a requirements contract for two years with a trailing price index for 132,000 to 151,000 tons of steel in each of those two years, respectively. We submit a bid that responds to that and provides pricing. And this, we're talking about Excel spreadsheets with detailed pricing for every single part. I think there were over 200 parts that we were asked to bid on. We provide a bid, and the bid says, here's your trailing index pricing, two-year contract, galvanized steel, and we're going to provide, we'll provide this, but we want, we have to have a volume of 50. And so they accept our bid. Now, right there, you've got offer and acceptance on its face. And about the only argument that they made, you know, at this point, the only thing that the UCC would require would be quantity. And we have a series of e-mails exchanged between a gentleman named Dieter for national material and a gentleman named Baker for GSI, whose testimony conflicts about the conversations they had that are reflected in these e-mails, a clear question, a credibility question for a jury to decide. And in that final e-mail, November 30th, 2007, Mr. Dieter says, we are confirming that you're going to take 121,000 and 132,000 tons of steel between that number over the course of the two-year period of the contract. We are confirming that. Why? Because we have to make a commitment to our upstream supplier to get this for you. And when you think about what's happening in the context of this party's relationship, they are asking for a requirements contract. You know, you can't just go on and buy this type of specially made product off the shelf on the day you need it. It takes weeks or months, most often, for this type of product to be produced. And the only way a requirements contract like this is going to work is if you have it in inventory in stock. And this is what their request for proposal asked for. They want to have it available when they need it. That's what a requirements contract is all about. And so the only way you can meet that is to have a pipeline of material in place, and we, as the seller of the steel, need to back that up with a mill behind us. And so we go back to ArcelorMittal Steel, and we get a commitment from them to provide the galvanized steel, which is dipped in zinc. That's what makes it galvanized, in order to meet these requirements contract. And then we confirm that with them in writing. And they make no objection to that whatsoever. There was no response. There was no response. That's correct. So do you consider that a confirmation? Yes. No response? Yes. Now, one of the arguments that GSI hammers away at in their brief is that, well, about a week later, they sent us a contract. And that was the objection, because that said, we're not making any final commitment. But the problem with that argument is that contract was sent by a fellow named Hilt. And Hilt didn't know anything about what was said in our confirmatory email. If you look at the secured confidential record, and specifically I'm talking about pages C-12, 16 at the bottom. So does that mean that they were trying to amend the contract at that point? No. No. I think it's just a situation of an agreement has been reached between the business people, Mr. Dieter and Mr. Baker. And I think the right hand didn't know what the left hand was doing. Because Hilt sends out what is basically a foreign contract. They contend it was all this effort put into this contract. But that contract is the exact same contract that GSI sent to National Material a year earlier, in 2007, when we had the exact same situation planned. There was a requested proposal made, a bid made, it was accepted, a trillion in its price. And sure enough, what happens? The parties, they send us one of these foreign contracts. It never gets signed, but the parties perform the contract. So there was clearly an intent to be bound. And I think, again, this is the important point. You know, maybe a jury could find that that was intended to be something different. But that's why there's a jury question here. Because a jury could go either way in this, and that's really all we're asking for in this case, is a chance to prove at trial that there was an intent to be bound, that they wanted this contract, they made an agreement to it, and the only reason they reneged was because the steel market turned at a point where they could then, after nine months into this contract, they could turn around and start buying steel on the spot market at dirt cheap prices way below what we were going to be able to charge under our written contract. Now, the course of dealing that you're basing your argument on, the nine months, is that the exact course of dealing on the materials and requirements for materials and everything that was embodied in the dispute and ultimately inability to reach a written contract? I'm not sure I quite have your point. In other words, you've got a course of dealing. You've got activities you've got. Well, course of dealing is what happened in 2007. Right. And course of performance is what happened in 2008 under this contract. Yeah, of course, performance. So they're performing acts. Yes. The disputed – the two of you were performing acts. The disputed contract terms deal with the same activities of performance that you're already doing. Is that your argument? In most respects, but no, not entirely, because they changed exchange contracts that didn't accurately reflect what the bargain was that the parties had reached. I mean, that's why I think there's a question. Well, that's not quite what my question is. Okay. You've got a course of activities. Yes. That is ongoing. Yes. Is the subject of the contract dispute and ultimately inability to reach a written contract, is the subject of that the same as the course of activities? Oh, yes. Yeah. Oh, yeah. I'm sorry. I didn't – that was my question. Let me follow up on Justice Goldenherz's question. Sure. Was the course of performance the one that was set out in the email or in the contract that was sent? The only difference that exists between the course of performance and what was in – I'm sorry. What was in the – you're asking the course of performance and the agreement was the same. Yes. What the parties did – Agreement. Wait. The word agreement means what? Meaning the agreement that was reached between the offer, the bid, its acceptance, was originally contained in the request for proposal, the offer, the acceptance of that offer, and the confirmatory emails that said here's the quantity. Yes. That's what I'm talking about, the emails. Yes. The course of performance was entirely consistent with that. With the emails? Yes. But then there was this proposal for contract that was sent later. That is correct. They sent a form contract. So my question is was the course of performance also consistent with the contract that was sent or was it consistent with the emails? The only point on which the contract that was sent disagreed with what was in the emails  A volume commitment. A volume commitment. Correct. They were taking the position that we only have to buy from you whatever we just sent a purchase order for, which, you know, is really when you think about it – Which is a significant term. It is, but it's completely counterintuitive because the whole point here was to have an agreement where it's a requirements contract. Why would we, why would any reasonable person give a very competitive price with the understanding that you're going to buy so much over two years, or with the understanding rather, that you're only going to buy on whim? You know, I'm going to go and I'm going to sign a contract with the mill that I'm going to buy 121,000 to 132,000 tons of steel in the next two years from the mill to supply you, but you're under no obligation to buy anything from me except what you ask for. Nobody. That's what doesn't make any sense. I'll ask him when you come back. Okay. Thank you. Thank you, counsel. Counsel? Thank you. There are three independent grounds. Are you Mr. – who are – what's your name? I'm sorry. Ken Schmetter. Okay. I'm just having a tough time reading it. Okay. Thank you. Mr. Schmetter? Thank you. Okay. Turning first to your contract now, there are three independent grounds for this court to approve the summary judgment on account of – the first – On account? The two-year contract now. Yes. No. The first is the one-year statute of frauds. Now, that has nothing to do with the email confirmation. That's the UCC statute. I'll turn that home. The issue with respect to the one-year statute of frauds is does it apply? And their argument is that it does not because the UCC has its own separate frauds and they can flip. The Illinois Supreme Court ruled on this issue. Now, granted, it was a long time ago in a farmer's brain, and it dealt with application of the separate statutes of fraud under the Uniform Sales Act and the one-year statute of fraud. And plaintiff just says, well, it's stale and it shouldn't apply anymore. But first of all, stale or not, it is the law of the state of Illinois, and its reasoning in any event is not stale because it's not as though the Illinois Supreme Court based its ruling on some specific language in the Uniform Sales Act statute of frauds that's been changed by the UCC. The point of the court's ruling was that the two statutes of frauds were different from each other, yet they had independent application. Both applied because one did not affirmatively amend or displace the other. That's still the case. And so this ruling is not stale based on, among other things, the first principle of statutory construction. Look to the plain language of the statutes. It just does not contain the exception that plaintiffs ask. And the Illinois legislature knew how to write in such an exception. How do we know? Because it's done so. It did so elsewhere in the UCC with respect to contract for sale securities. Do you have a problem with a general statute of frauds and a more specific application of the ruling, the rationale behind the statute of frauds? No, the rationale behind the one-year statute of frauds is that, over time, it is susceptible to different perspectives, fading memories, and stale evidence. And so that rationale is not the same. No, I'm aiming more at that. I understand the general policy basis of it, but do you have a specificity problem between the two? The general statute of frauds, which is applicable across the board, and the succession to the Uniform Sales Act. The Uniform Sales Act had a completely different legislative intent between that and the Uniform Commercial Code. I might not be understanding your question specifically, but that's for the thing I'll warn and question when I ask questions. But I can tell you, the Illinois courts simply do not presume conflicts unless there is a conflict. I'm not asking about a presumed conflict. Absolutely, we operate under the presumption that there is no presumed conflict. That's right. We find one, and here it's just black letter law school of specificity and generality. That's what it means. Oh, no, I disagree. One specifically applies to purchases for the sale of goods for $500 or more. The other, just like the Sales Act, involved the sale of channels for $500 or more. The other specifically applies to contracts that last over a year. And each of them have different sets of principles and policy issues that the legislature was concerned with. And when one does not affirmatively amend or displace the other, the Supreme Court and other courts have held, they both apply. In fact, the Illinois legislature considered but refused to adopt a proposed UCC amendment that would have provided just the sort of exemption that Plaintiff asked for. And since the legislature refused to adopt it, Plaintiff asked this court to adopt it by disregard of the Illinois Supreme Court and Farmers Grant. So you're saying that the dismissal of the contract count was valid based upon the statute of fraud? One-year statute of frauds, no meeting of the minds, which I can turn to in a moment if you'd like, and the UCC statute of frauds. Correct. Are three independent grounds. Okay. But one is strictly a question of law. I think they both are candidates. Well, the two statute of frauds are a question of law. No, I think the meeting of the minds is also. Okay, well, I'm going to accept that for right now so we don't get into an argument. Okay. But what I want to ask about is if you accept the fact that there's a dismissal of the count on the contract for statute of frauds. How could there be an unjust enrichment count? Sure. How do you get that dismissed? Sure. Actually, there's three separate grounds for that, and it has nothing to do with the absence of a two-year contract. Because consider a normal unjust enrichment claim might be I fix up your house, you don't pay me, and now you have benefited and you have been enriched. Well, do I have a contract or not? Well, either you have a contract, or if you don't, you can have an unjust enrichment claim. Right. But this is a completely different type of claim. In this case, there is no doubt plaintiffs, we, GSIR claim, paid plaintiff tens of millions of dollars, and they earned millions of dollars in profits off of that steal. And so their theory of this unjust enrichment claim is, well, if you didn't buy it from us, you would have had to buy it from somebody else, and we were persuaded to pay, to sell you for less. You would have had to buy it from somebody else for more, and therefore you saved money. Okay, that's their theory. This fails for three independent reasons. Okay, but has the court gotten that far? Has the court gotten to the point where it has assessed all of those facts and found that there can be no issue of fact? There are no issues of fact of three separate grounds. No, but has the court done that? Well, I think in the summary judgment ruling, the court identified three grounds to enter judgment on that claim that have nothing to do with any disputed facts. There are no disputed facts in this, and if I could just illustrate. Okay. There is one. One is what makes alleged enrichment unjust? It has to be based on something like fraud, duress, or undue influence. This was based on fraud. Paragraph 91 of the complaint, in the unjust enrichment claim, it says, you willfully misrepresent a divine commitment to us to obtain beneficial pricing. However, that was the same claim that was their fraud claim in Comfort that was dismissed. As a matter of law, we cited a number of cases, none of which were distinguished. When you sue for unjust enrichment based on a fraud theory and the fraud fails, the unjust enrichment claim fails as well. They just cited probably half a dozen cases and they didn't distinguish one of them. And by the way, plaintiffs knew this because below, they asked the circuit court, can we please plead a new fraud claim? This was years after it was dismissed, after the discovery was over. Can we please plead a new fraud claim, or try to, to help support our unjust enrichment claim? And they didn't attach a proposal, and the court said no. That order was, frankly, not appealed. So that's the first grounds. It has nothing to do with any disputed facts. So you're saying this was a procedural dismissal, basically? Well, their unjust enrichment claim was based on a fraud claim that was dismissed. I got that. Yes, that's right. That's right. I understand what you said. Okay. And I'm looking at it. So you're just saying that because the fraud claim was dismissed, this was dismissed. Well, that's what the unjust enrichment claim was. Because the allegations are the same. Well, that's right. And that's what Illinois courts have held. I don't dispute the law. I just want to make sure I get procedurally correct. So that's one. The second one is that unjust enrichment claims fail, as you noted, where the subject matter of the claim is governed by contract. Set aside the two-year contract. That's the statute of frauds, and I hope I have time to turn to the meeting of the minds. It was properly dismissed. But the subject of the unjust enrichment claim is the price paid for steel. The price paid for steel was governed by individual purchase orders that were issued and accepted. Each purchase order that's accepted is a contract for the sale of that steel. So that's another question I had, is do you think that each individual, do you think there were multiple individual contracts here? In other words, each purchase that was accepted was an individual contract? Well, as opposed to a broad comprehensive contract. Well, if I hopefully have time, if we turn back to the meeting of the minds, and it's tied to that a little bit, purchase orders were issued as there were negotiations and draft contracts going back and forth over many, many months. And it wasn't, by the way, just the quantity, the volume of steel. There were issues going back over an obligation to purchase inventory, dispute resolution, who pays for shipment of non-performing steel, indemnity, warranties, how to handle rustling. All these were being negotiated. And, in fact, our GSIs lawyers were reaching out to them after the supposed contract. And throughout this entire period, nobody said, from plaintiffs said, we'll get, we will, you know, hey, wait, there's already a contract. They said, we'll get back to you. We'll get back to you. And that went through June. And, yes, through this time, we were issuing purchasing orders. And in the absence of any comprehensive contract, yes, for purposes of unjust enrichment, if you have a governing document that sets the price of something, you can't have an unjust enrichment claim based on it. Now, wait. You just mentioned if you have a contract that sets the price of something. If you have a document that sets the price of something, you have a contract. For that. That would fall under the UCC definition of statute of frauds. No. Because once you have a price, you have a contract under the UCC. Oh, yes, with respect to those specific purchase orders, for sure. Exactly. In fact, there's no dispute about that. Okay. So their argument, though, is that that should apply throughout. No. Their argument is something different. Their argument is that there was meeting of the minds in a full two-year comprehensive contract that included a minimum volume tonnage requirement, obligation to purchase inventory, and other issues that were disputed. Okay. So if I can just finish up the thought on the unjust enrichment claim. The third independent ground for summary judgment on that claim was there's supposed to be an unjust enrichment to plaintiff's detriment. If plaintiff says, sure, I made millions of dollars in profits, but if you had to buy steel from somewhere else, you might have had to pay more, and therefore you saved money. And even if that's an unjust enrichment, the detriment to them is what? They don't say. And, in fact, they cited the Clarity case. And the Clarity case dismissed an unjust enrichment claim for that very same reason. Well, you say they benefited from the retention of sales revenues, but that doesn't tie to any detriment of yours. So those are three reasons why the Circuit Court probably granted summary judgment on the unjust enrichment count. What do you think about count five still pending? What influence does that have on this case? I think very little. Just that the Circuit Court, we just discussed the Circuit Court just decided they wanted to see what all would be left before it had a trial, whatever was left. But I think it's just. Do you think that's the purpose of this court, is to tell you what to do so you can have a trial? I mean, we got our ruling. Plaintiff asked for 304A language. The judge gave it to him. I was ready to proceed, but that was the judge's ruling. Okay. So back then to the. . . So the one-year statute of frauds absolutely applies. And it was not. . . Nothing that plaintiff has talked about could have satisfied that. They pointed to one email, an internal GSI email sent after we sent our draft contract to them and said, let us try to convince the jury that maybe it had to do with this conversation and that email. We cited four cases that were not distinguished that explained why that can't be. The email referenced this internal email from the sales purchasing agent. It referenced no oral discussion, no NMC emails, no tonnage commitment, no contract, particular contract at all. And we cited four cases affirming some of the judgment and dismissal orders when plaintiffs try to base a statute of fraud, general statute of frauds, on an email, on a writing that doesn't specifically tie back to anything that you need to. And they just can't point to anything. Explain to me why you believe the general statute of frauds applies here as opposed to the more specific. They both apply. In a case in which you have a. . . In most cases involving the UCC, it might be a little, you know, a purchase order, a couple of small requests. There are very few cases that involve situations where you have both a purchase of goods for more than $500 and that lasts more than a year. And so the question is, why should it apply? Number one, because the plain language of the statute says it applies and provides no exception. Number two, if the Illinois Supreme Court ruled on this very issue almost 100 years ago, it was on the same issue under the Uniform Sales Act statute of frauds. Number three, Illinois courts are consistently making clear that you strive to harmonize independent statutes, not find conflict in it, unless it's impossible. How do we know it can be harmonized? Because courts in Illinois have already done so. That's why. Now. . . Do you agree that the industry in which these transactions occurred are specialized industries? Are they specialized industries? Right. I mean, not everybody is in the galvanizing business, for example. I mean, I would say that it certainly takes some expertise. But frankly, given the complexity of this deal, it was one of the reasons why the parties strived so hard to have a comprehensive two-year contract that covered a number of terms that were disputed. I don't know if that answers your question. It does. In fact, I'd like to just. . . But I think that impacts on the course of dealings, do you not? Well, no, it doesn't, actually. And let me turn to. . . Actually, there are. . . Let me. . . I don't think it does. I don't think course of dealings helps them in this case. I'll explain why. Turning to the meeting of the minds, if I can. There is no dispute. Turning first to the period of time where you have the request for a proposal, the bids, and then the acceptance of the bid. Even plaintiffs have admitted. . . Even author witnesses have admitted. There was no minimum tonnage volume set down anywhere. There was no. . . Everything for the estimates. There are a piece of. . . This is not a contract. And the reason they admitted there was no contract set there is because. . . Because they are the ones who, a month after this, started having further communications and conversations and e-mails and contract negotiations. So they understood that there wasn't a contract then. So that takes us to. . . You talked about the. . . Yes, there was a conversation that's disputed. And yes, there was an e-mail. Which, by the way, we don't think is sufficient under the UCC statute of frauds to confirm that. However, there's no dispute what happened next. And the court relied on this also. December 7th, a week after that e-mail, they received GSI's contract. Six weeks later. . . Now we're in the middle of. . . This is months after the alleged contract is supposedly in place, according to plaintiff's theory. Plaintiff's sentence provides a contract. And it included 33 changes. 33 revisions. And what's interesting about their contract is it's interesting and undermines their claim. Even before you get to the six months of arguing back and forth. When Mr. Fergus, plaintiff's vice president, sent it, he didn't say, hey, here is our contract, what we really agreed to. He said, sorry for the delay. Lawyers had it. You should show this to your lawyers. The second thing that's interesting about that contract, that's their own draft contract, is that it continued to incorporate provisions that are completely inconsistent with their own theory of the contract. In fact, their own witnesses looked at it and said. . . And they saw provisions saying volume quantities were estimates. The parties regularly meet to adjust them. GSI had no need to buy anything unless it needed it and issued a purchase order that was acceptable. Terms inconsistent with their current theory today of what supposedly had been reached a couple of months beforehand. You're speaking so quickly, it's difficult to even understand. I apologize. The point is. . . Sorry. Even, I apologize. Even under their contract that they sent weeks after, months after they claimed the contract was alleged, they sent, they made dozens of revisions, including revisions that were inconsistent with their own theory of the contract, and that their own witness admits they had never discussed with us. Again, multiple substantial material revisions. And so, after. . . And so they said, take it to your lawyers. And we did. And yes, in the course of this, there are purchase orders that are being issued. There are purchase orders, and as they're trying to negotiate a contract. But there were. . . The record is undisputed. There were emails back and forth. There were conversations. We need to meet. No, we need to resolve contract verdicts. We need to get this done. There's no dispute about that. And there's no dispute that when GSI's lawyer called up their lawyer and said, look, let's walk through piece by piece. Here's 17 that we cannot agree to. And they never said. . . Now, we're in May. They never said, there's been a contract all along. They said, we'll get back to you. A month goes by. And our guys said, their purchasing director said, where are we? We need to wrap this up. We need to get this done. And they didn't say, oh, there's already a contract. They said, we'll get back to you. But they didn't. Now, with these undisputed facts, there are certain legal principles on meeting of the minds. And I'll come back to your question on course of conduct. Contract claims fail as a matter of law where negotiating parties clearly contest material terms, as they did here. Where contract negotiations continue, after the contract was allegedly reached, there is no contract. I mean, these are cases. We've cited multiple cases. Even under the UCC, volume is an essential term. Courts will not insert it. And even when there is an agreement on price and volume, still no contract exists when negotiations reveal clear disagreement over terms and material to the parties. This is the Central Illinois Light case. Okay. If you really want me to understand it, you need to slow down. Please. I apologize. I'm just slow. I apologize. I apologize. The point is, there was an ongoing course of clearly disputed negotiating provisions of many, many material terms before, during, and after the point which they are now saying a contract was reached. But at the time, they acknowledged, we have no agreement. We're trying to work it out. Oh, we understand your differences. We'll get back to you. And Illinois courts have made clear that when that happens, there is no contract. It's a matter of law, and those facts are undisputed. But in the meantime, all of these purchases are occurring. Yes. As we are negotiating the broad parameters of the comprehensive contract. Go ahead. May I finish this? Yes, please. So, course of dealings. Remember, these course of dealings, issuing a purchase order for steel that our client wants, is actually completely consistent with the contract that we had said when the proposal, which said, we're not going to buy anything beyond what we want. And so, the course of dealings says nothing about all these other issues that the parties were continuing to negotiate. That's why we were continuing to negotiate them. And that's why there was no meeting of the minds. Thank you, counsel. Thank you. Counsel? Just a couple of quick points. You know, Mr. Schmaderer likes to talk about how this deal was, these were only individualized purchase order contracts, no overarching contract. Take a look at the purchase order. The purchase order says, these terms do not take precedence over any existing contract. Well, that's the question of fact in this case. We say there is an existing contract for the two-year requirements, and they're saying, no, it's a series of individual contracts. Well, the individual contracts that they're relying on create the question of fact because they say the individual contracts do not take precedence over an existing contract. Any existing contract. Any existing contract. Meaning there may not be an existing contract. I didn't hear you. I said he left out the word any, and I think that's important. That's true. There may be, but there may not. And that's what the jury needs to decide. What were you negotiating, then, if you already had a contract? There are certainly other terms that you might negotiate. Well, let's put it this way. As judges, I'm sure you've faced the circumstance where you've had a motion to enforce a settlement agreement. Maybe something more closer to home than the steel contract that we're talking about here. But you can have situations where the plaintiff and the defendant have had an exchange of conversations or correspondence where they've agreed to sell the case for a certain amount of money in exchange for a general release, okay? And now it comes time to memorialize the agreement. And all of a sudden, someone's got cold feet because there's no confidentiality clause. There's no indemnity agreement in it. And now all of a sudden, the other side's saying, no way. We had an agreement on the material terms. We had an agreement. You gave me, I give you money. You give me a general release. And that's the end of it. And that's why you end up in court. And that's why courts sometimes do, sometimes don't because it's a question of fact. We'll find that there was a meeting of the minds on the settlement and that the other ancillary terms that the parties were trying to negotiate may or may not have been agreed upon. But they did have an agreement and an intent to be bound on the release for the settlement payment. And that's why a motion to enforce a settlement agreement. Of course, in this case, it's really no different. That's the parallel here. We had an agreement on price. And I won't end quantity. End the product. Write down to Excel spreadsheets with very detailed identity of all the parts over the two-year period. That's what they asked for and that's what they've got. The thing I want to stress here is, you know, when you look at those individual purchase orders that he's so focused on, what was the price they got? The price they got was the price that we gave them with the understanding that it was a two-year agreement. If there was no two-year agreement, we would have been free at that point to charge them the spot market price, which was way higher. And that's why I say from either a contract standpoint or an unjust enrichment case, this is they are taking advantage of having made an agreement to buy a certain quantity at a lower price and now contending that, oh, well, you should purchase orders for all of that. So there was no contract, but the price on the purchase orders was the price that was agreed on for buying. It wasn't the spot market price, so it just doesn't fit and that's why there's the inherent unjust fairness. And your company couldn't have gone to the spot market price and sold it to them? Well, that would be ideally what we would have liked to do, but that was the course of performance. That's the course of performance of the actual contract is because we sold it to them under the purchase orders at the contract price, not the spot market price. That's why there's evidence of a contract here, or at least a question of fact for a jury to decide what the parties intended. What about Mr. Schmetter's argument initially about the dismissal based on the statute of frauds? Could you just go over that for me again, your position? You said that it's dismissed based on the statute of frauds. Well, I think that the judge's decision on that, and again, remember, the judge didn't really write a decision in this case. The judge adopted GSI's proposed findings of fact and conclusions in total, so he just basically adopted their brief. The dismissal of the general statute of frauds, the court found there was no question of fact that there wasn't sufficient writings to satisfy it. And we say that a jury, and that is a jury question as to whether the writings are sufficient to satisfy the statute of frauds. There's lots of writings. There's the request for the invitation to deal represented by the request for proposal, which stated the quantity. We have our offer, which said contingent on following commitment with bid and the price. They accepted it. That's undisputed that they accepted the bid. And then we have the exchange of correspondence that narrows down the quantity. Right. I want to ask you something real quickly before your time ends. What relief would you want from this court other than the reversal? I would like the court to find, first of all, that the UCC statute of frauds applies because I think the court below needs guidance for that purpose for the trial. And I would reverse the remand for trial on the breach of contract count, count three, or alternatively, the unjust enrichment count, count eight. And, you know, the case can be tried at the alternative, and the jury can be instructed on those two counts. Thank you, Counsel. Thank you. We appreciate the briefs and arguments of counsel. We'll take this case under advisement. We'll take a short recess, and then there will be people briefed.